**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **DEBRA KAY MCDANIEL,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **7:18-CV-02091-KOB** |
| | ) | |
| **ANDREW SAUL,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On January 13, 2016, the claimant, Debra Kay McDaniel, protectively filed a Title II

application for a period of disability and disability insurance benefits and a Title XVI application

for supplemental security income. In both applications, the claimant alleged disability

commencing on December 18, 2015, because of diabetes, depression, migraines, generalized

anxiety disorder, back pain, slipped disc in neck, iron anemia, neuropathy, peripheral

neuropathy, vitamin D deficiency, and fibromyalgia. (R. 96–97).

On February 25, 2016, the Commissioner denied the claims. Approximately two weeks

later, the claimant filed a written request for a hearing, and on November 17, 2017, the

Administrative Law Judge held a video hearing, with the ALJ presiding over the hearing from

Birmingham, Alabama, and the claimant appearing via video from Tuscaloosa, Alabama. (R.11).

In a decision dated May 1, 2018, the ALJ found that the claimant was not disabled as

defined by the Social Security Act and was, therefore, ineligible for disability insurance benefits

and supplemental security income. (R. 8). On November 7, 2018, the Appeals Council denied the

claimant's request for review. (R. 1). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). As explained below, because substantial evidence does not support the ALJ's findings regarding the claimant's fibromyalgia, this court reverses and remands the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUE PRESENTED

Whether the ALJ's finding that the claimant's fibromyalgia was not a medically determinable impairment lacks substantial evidence in the record.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Brown*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions regarding whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational

factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R §§ 404.1527(d), 416.927(d). Whether the claimant meets a listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, it cannot reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The Eleventh Circuit has recognized that "fibromyalgia, a chronic pain illness, is usually diagnosed based on an individual's described symptoms because the 'hallmark' of the disease is a lack of objective evidence." *Brown-Gaudet-Evans v. Comm'r Soc. Sec.*, 673 F. App'x 902, 906 (11th Cir. 2016). The ALJ must "find that a person has a [medically determinable impairment] of [fibromyalgia] if the physician diagnosed [fibromyalgia] and provides the evidence described in II.A or section II.B, and the physician's diagnosis is not inconsistent with the other evidence in the [claimant's] case record." SSR 12-2p.

Sections II.A and II.B provide two sets of criteria for diagnosing fibromyalgia: the 1990 American College of Rheumatology (ACR) Criteria for the Classification of Fibromyalgia *or* the 2010 ACR Preliminary Diagnostic Criteria. SSR 12-2p §§ II.A & II.B. The 1990 ACR Criteria require that the claimant show (1) a history of widespread pain; (2) at least 11 positive tender points on physical examination, found bilaterally, on the left and right sides of the body and both above and below the waist; and (3) evidence that other disorders that could cause the symptoms or signs were excluded. SSR 12-2p § II.A.

The 2010 ACR Criteria require that the claimant demonstrate (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-concurring conditions; and (3) evidence that other disorders that could cause the symptoms, signs, or co-concurring conditions were excluded. SSR 12-2p § II.B. Symptoms and signs of fibromyalgia include muscle pain, fatigue or tiredness, muscle weakness, headache, numbness or tingling, dizziness, insomnia, depression, nausea, chest pain, shortness of breath, and hair loss. *See* SSR 12-2p § II.B n. 9 (citing 20 C.F.R. 404.1528(b) and 416.928(b) and Table No. 4, "Fibromyalgia diagnostic criteria," 2010 ACR Preliminary Diagnostic Criteria). Some co-concurring conditions include depression, chronic fatigue syndrome, gastroesophageal reflux disorder, and migraines. SSR 12-2p § II.B n. 10.

Further, the law obligates the ALJ to develop a full and fair record. *Kelley v. Heckler*, 761 F.3d 1538, 1540 (11th Cir. 1985). If an ALJ finds insufficient evidence to determine whether a claimant has a Medically Determinable Impairment (MDI) of fibromyalgia, he "may recontact the person's treating or other source(s) to see if the information [the ALJ] need[s] is available" or order a consultative examination to determine if the claimant has a MDI of fibromyalgia when he needs that information to adjudicate the claim. SSR 12-2p III.C.1 & 2.

# V. FACTS

The claimant was forty-nine years old at the time of the administrative hearing (R. 64); had completed a master's degree in special education (R. 64); has past relevant work as a special education teacher, case worker, and job coach (R. 89); and alleges disability based on fibromyalgia, diabetes, depression, migraines, generalized anxiety disorder, back pain, slipped disc in neck, iron anemia, neuropathy, peripheral neuropathy, and vitamin D deficiency. (R. 96–97).

*Physical and Mental Impairments*

The claimant presented to the Emergency Department at DCH Regional Medical Center on December 11, 2008 for sudden chest pain. After evaluation, the hospital admitted her, and a CT of the spine revealed a pulmonary embolus. (R. 303). During her stay at the hospital, Dr. Larry O. Skelton, M.D., noted her history with peripheral neuropathy, anxiety, and depression. (R. 304).

From January 2013 to June 2018, the claimant sought treatment from Dr. Larry O. Skelton, a primary care physician, for her various conditions. (R. 329, 437,). On June 22, 2013, the claimant presented to Dr. Skelton's office for pain in her right lower back and a refill of medications. During this visit, Dr. Skelton noted her back would catch when bending, making it hard to stand back up. This pain was severe, lasting roughly three weeks but appearing to get worse. He also noted that the claimant suffered from pain in the right hip area with no radiation down her right leg. Under the problem list, he recorded the claimant's ailments as depression, diabetes mellitus, fibromyalgia, mixed hyperlipidemia, myalgia, myositis, and plantar fascial fibromatosis. Dr. Skelton increased the claimant's Zoloft prescription for her depression. (R. 431).

Approximately six months later, on December 23, 2013, the claimant returned to Dr. Skelton for a checkup, lab work, and a refill of medications. During this visit, the claimant indicated that she felt very tired all the time. (R. 424).

The next month, on January 27, 2014, the claimant went to the DCH Regional Medical Center medical oncology department reporting "I haven't been here in a while[.] I didn't have insurance; I've been feeling bad." Jo Anne Miller, CRNP, saw the claimant, noting the complaints of heavy menstrual periods and extreme fatigue. The claimant's primary diagnosis consisted of iron deficiency anemia, which the medical staff believed was related to a prior gastric bypass surgery and heavy menstrual cycles. Dr. John W. Dubay signed off on NP Miller's assessment. (R. 718–719).

Almost two months later, the claimant saw NP Miller again on March 12, 2014. NP Miller noted the claimant's continued iron deficiency anemia and encouraged her to see a gynecologist to evaluate her heavy periods. (R. 720–721).

On June 23, 2014, the claimant returned to the oncology clinic to see Dr. Dubay for a follow-up, stating the same previous complaints regarding heavy menstrual cycles, which continue to worsen each month, and severe fatigue. (R. 722). Two months later, in August, 2014, to try to help her extreme fatigue and worsening menstrual cycles, the claimant underwent a hysterectomy. In the claimant's pre-admit history, Dr. DeAnn M. DiPiazza noted the claimant's past medical illnesses included fibromyalgia, neuropathy, anxiety, and depression. (R. 326–334).

On September 26, 2014, the claimant returned to Dr. Skelton for a checkup, lab work, refill of medications, and to discuss the claimant applying for disability. Dr. Skelton documented the claimant's symptoms as "tired all the time, no energy, [and] has chronic anemia." (R. 416).

Dr. Skelton also noted the claimant's "peripheral neuropathy [in] both feet and lower legs" and found six of eighteen trigger points that day when evaluating her fibromyalgia. (R. 418).

The claimant again sought treatment with Dr. Skelton on August 11, 2015, complaining of back pain, feet pain, and lack of sleep because her sleeping pills were not working. Dr. Skelton noted, "patient slipped this weekend and has also been walking for about a week and muscles are sore. Pain stays in lower back, no radiation, pain is better than Sunday." Because of her severe pain, Dr. Skelton referred the claimant to a pain management specialist and started her on Lyrica. (R. 412).

Three months later, on November 11, 2015, the claimant followed-up with Dr. Skelton to evaluate her condition after the medication change. During this visit, the claimant indicated she was having daily bad headaches for the last two months, which were associated with nausea and left leg spams at night. She cited the headaches as severe and at times a ten out of ten on the pain scale, causing her to take Tylenol three to four times daily to combat the pain. (R. 409). In response, Dr. Skelton ordered an MRI of her brain that showed no significant abnormality. (R. 440).

On December 21, 2015, the claimant presented to the DCH Regional Medical Center Emergency Department for intermittent shortness of breath, which had persisted for the past several months. While at the hospital, the claimant also complained about headaches and leg pain, which had persisted for roughly one month. She stated she had taken four 500 mg Tylenol tablets every four hours for roughly a month or longer to help alleviate the pain. Dr. Margaret S. Morr admitted the claimant for further evaluation. (R. 348).

While in the hospital for evaluation, Dr. Morr ordered a neurology consultation on her headaches. During the neurology evaluation, Dr. Robert D. Slaughter noted "[p]atient is a 47-

year-old [f]emale with history of long standing 'sinus headaches' that have been frequent over the years. They are severe po[u]nding and associated with nausea and sensitivity to light and noise. She has had an ongoing headache similar to this for 6 weeks." The claimant would regularly take Norco and Tylenol with no benefit.  A MRI of her brain was normal. Dr. Slaugther treated her headaches in the hospital with Imitrex and Topamax. (R. 377, 359).

Also, while in the hospital, Dr. Carson B. Penkava ordered a bilateral lower extremity venous doppler ultrasound for the claimant's leg pain and a CT scan without contrast because of her headaches. The ultrasound showed no deep vein thrombosis in the right or left lower extremity, and the CT head scan showed no abnormalities. (R. 383-84).

On December 23, 2015, Dr. Charles Abney discharged the claimant from DCH Regional Medical Center. The claimant was to follow up with her primary care physician, Dr. Skelton, in one week and Alabama Neurology in two to four weeks. Her neurologist instructed her to continue to take her medications as directed. (R. 359).

One week after discharge, on December 30, 2015, the claimant followed up with Dr. Skelton. During this follow-up, Dr. Skelton noted the claimant's severe pain.  Under the section "Problem List," Dr. Skelton indicated "7/20/11 – FIBROMYALGIA" and "11/11/15 – FIBROMYALGIA."  Her medication list included Imitrex for her headaches, Klonopin for anxiety, Robaxin for muscle spasms, Topamax for pain, and Zofran for nausea.  Dr. Skelton's assessment included major depressive disorder, migraine, and lower back pain.  He prescribed Wellbutrin for her depression and Neurontin for her pain and neuropathy.  (R. 405, 407).

On January 11, 2016, the claimant followed up with Dr. Brian K. Hogan, a neurologist with Alabama Neurology & Sleep Medicine. Dr. Hogan documented the claimant's fibromyalgia, depression, diabetes mellitus, and high cholesterol, noting that she overused

medication to try to treat her headaches. (R. 464). He also noted that "[p]atient reports that headaches began at 46 years (daily constant headaches for at least 6 months prior to that sporadic 'sinus headaches') of age. The headache occurs daily. The headache is experienced upon awakening (occasionally waking her up). The headache is characterized as severe, pounding, and throbbing (sharp at times)."

Dr. Hogan documented that the claimant's symptoms have been associated with "anxiety, blurring of vision, depression, neck pain, stress, photophobia, nausea, vomiting, sinus pain, [and] phonophobia." He noted that, although the claimant underwent previous diagnostic tests such as an MRI and CT scan, neither indicated abnormalities. Despite her taking Topamax and Sumatriptan for her severe headaches, she still suffers from constant pain. Dr. Hogan also noted that the claimant's crying spells increased after Dr. Skelton took her off Zoloft because of its potential interaction with the migraine medications. (R. 467).

In the review of systems, Dr. Hogan noted double vision, rapid change in vision, vision loss, decrease in urine flow, frequent urination at night, back pain, joint pain, neck pain, dizziness, headaches, hearing loss, loss of grip strength, memory loss, numbness or tingling in feet and hands, weakness, depression, frequent or severe anxiety, and cold and heat intolerance. He also noted the claimant displayed a normal attention span and ability to concentrate. (R. 467–468).

The claimant followed up with Dr. Hogan again on January 19, 2016, where he noted her continued struggle with intractable chronic migraines. (R. 464).

Six days later, on January 25, 2016, the claimant filled out a headache questionnaire for the Disability Determination Service, citing headaches several times a day for about eight months. She stated these headaches cause her to be very sensitive to light, usually forcing her to

sit in a dark room. She takes Topamax and Imitrex to treat her migraines, and although the medications somewhat relieve her headaches, she usually takes two doses to get relief but has a limit of three doses a week. Her headaches sometimes cause nausea, and her migraine medications sometimes cause fatigue, nausea, and the inability to drive when she takes Imitrex. Her headaches can last for days and the symptoms include nausea, pain, fatigue, and inability to leave a dark room or do simple things like clean. She stated she had not tried other therapies or treatments other than a nerve block, which helped reduce the severity of her headaches for two weeks. (R. 252-53).

Upon Dr. Skelton's referral, on January 29, 2016, the claimant saw Dr. Matthew Smith at Alabama Pain Management Physicians. The claimant described her pain as aching, sharp, stabbing, shooting, numb, burning, and throbbing sensations in her lower back, leg, and neck. Her pain was an eight on the pain scale and a ten at its worse; started ten years ago; and was constant. Typically, numbness, tingling, weakness, and headaches were associated with her pain. Her pain "usually does radiate to the legs bilaterally." (R. 475).

In his review of the claimant's systems, Dr. Smith noted neck pain and stiffness; leg cramps at rest; back pain; aching joints; muscle aches; hair loss; headaches; numbness; tingling; anxiety; depression; and history of anemia. He noted tenderness to palpation on her right and left sides with the "tenderness greatest about the lower lumbar facets." (R. 487).

In his assessment, Dr. Smith noted the claimant has fibromyalgia and that her generalized pain is "likely from fibromyalgia." He also noted the claimant's history of depression, obstructive sleep apnea, and obesity as "likely comorbid with FM and part of the same disease process." Dr. Smith's ordered MRIs of the claimant's cervical and lumbar spine for her neck pain and physical therapy for her pain. (R. 476-76, 488, 501).

On February 3, 2016, the claimant returned to Medical Oncology to check on her labs regarding her iron deficiency. Since her last visit, she underwent a hysterectomy, but she still had multiple complaints regarding her migraines and fatigue during this visit. (R. 724).

Ashley Horton, SDM, conducted a Disability Determination Explanation on the claimant on February 24, 2016. (R. 96–109). Under the Findings of Fact and Analysis of Evidence, Horton stated the claimant alleged problems with diabetes, depression, migraines, anxiety, back pain, slipped disc in her neck, iron anemia, neuropathy, and vitamin D deficiency. The Disability Determination Explanation listed the claimant's diabetes mellitus, migraines, fibromyalgia, affective disorder, and anxiety disorder as severe impairments and her hypertension as non-severe. (R. 99-104).

Dr. Robert Estock conducted a Mental Residual Functional Capacity assessment on the claimant on February 24, 2016 at the request of the Social Security Administration. He found no significant limitation in the claimant's ability to remember locations and work-life procedures; understand, remember, carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted; make simple work-related decisions; and set realistic goals or make plans independently of others. (R. 105-07).

Dr. Estock found moderate limitations in the claimant's ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; complete a normal workday/workweek without interruptions from psychologically based symptoms; perform at a consistent pace without unreasonable rest periods; interact

appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (R. 105-07).

The claimant followed-up with Jessica Wright, CRNP, at Alabama Pain Management Physicians on March 4, 2016. During this visit, the claimant stated her chronic pain was worse at an eight out of ten on the pain scale. The cervical MRI showed spondylosis, with a bulge and herniation at C5-6, but no associated cord involvement. A lumbar MRI showed mild spondylosis with no significant lateralizing mass or stenosis. (R. 492, 503).

On April 1, 2016, the claimant followed up with Alabama Pain Management Physicians, complaining that her chronic pain was widespread, although primarily in her legs, and was worse than the last visit. Although she completed her neck and lower back physical therapy, she stated she received no long-lasting benefit from the therapy, and her pain medication only reduced ten percent of her pain. (R. 506-19).

Dr. Audra Eason with Alabama Pain Management Physicians performed a cervical medial branch block on April 20, 2016 to relieve her neck pain. Dr. Eason noted the claimant was a "patient with a history of neck pain, unknown etiology." The claimant's pre-operation pain was a nine, but after the procedure, the claimant described her pain as a seven. (R. 521-22).

Five days later, on April 25, 2016, the claimant followed up with Heather Brewer, CRNP, at Alabama Pain Management Physicians, complaining about poor sleep and widespread chronic pain she described as a nine on the pain scale. (R. 526, 533).

On May 2, 2016, at a follow-up visit with Dr. Hogan, the claimant stated that she noticed a decrease in the number of headaches over the past two months and that the Topamax has helped, but she still had migraines that last several days. Dr. Hogan increased her Topamax prescription to 100 MG two times daily to reduce headaches and gave her Relpax samples to try

in place of the Sumatriptan. (R. 658). In the "Assessment & Plans" section, Dr. Hogan listed "Fibromyalgia. . . . this was considered in context of a sleep related breathing disorder." (R. 658-61).

On May 23, 2016, the claimant followed up with NP Brewer at Alabama Pain Management Physicians, citing the same complaints as previous visits. The claimant expressed that her medications were not effective in improving function or reducing her pain. (R. 541-42).

Four days later, on May 27, 2016, the claimant saw Dr. Eason for her first cervical interlaminar epidural steroid injection to treat her neck, upper back, shoulder, and arm pain. Before the procedure, the claimant cited her pain as a ten, but after the procedure, she cited her pain as a seven. (R. 558).

Roughly a month later on June 27, 2016, the claimant returned to Alabama Pain Management Physicians for her chronic widespread pain and saw NP Brewer. She described her pain as a ten on the pain scale and worse than her last visit. The claimant also reported an increase of pain in her left, lower back, above the beltline, that did not radiate into her lower extremity. NP Brewer indicated that the claimant's generalized pain is "likely from fibromyalgia. She has a history of depression, OSA, and obesity, all of which are likely comorbid with FM and part of the same disease process." During this visit, the claimant received a Toradol injection to treat her neck pain.  On July 25, 2016, the claimant returned, reporting her pain was about the same. (R. 562-7).

On August 10, 2016, Dr. Eason performed a second cervical interlaminar epidural steroid injection on the claimant. This time, the claimant cited her pre-operation pain as a ten and her post-operation pain as an eight. (R. 598). Over a week later, Dr. Eason also performed the first

lumbar medial branch block for the claimant's back pain on her right L3-L5. (R. 601, 604). The claimant reported her pre-operation pain as a ten and her post-operation pain as a five. (R. 603).

The claimant returned to Dr. Skelton's office on August 22, 2016, stating that the Klonopin was not helping her anxiety and complaining of back pain. Dr. Skelton added a prescription for Zoloft to help with her anxiety. (R. 856-59).

The next day, on August 23, 2016, the claimant followed up with Katie Guess, CRNP, at Alabama Pain Management Physicians, for the chronic pain in her back, legs, neck, head, hip, and knees. On the computerized form under "The patient has noted an improvement in their ability to do the following," a computerized check mark is before the words work, cook, stand, drive, perform ADLs, sleep, sit, housework, hobbies, walk, and exercise. But at the same visit, the claimant reported "sleep-poor" and "mood-poor" under "Review of Systems" section. The claimant reported no relief that day from her previous interlaminar epidural steroid injection. She also reported that since the procedure her migraines have increased. (R. 606-19).

On September 7, 2016, the claimant returned to Dr. Hogan for a follow-up and reported that she still has "very frequent headaches," but they were no longer daily. She reported having migraine symptoms even with her milder headaches. (R. 662).

On September 20, 2016, Ashley Vaughan, CRNP, at Alabama Pain Management Physicians noted the claimant's chronic pain was worse. (R. 622). The claimant was to start Botox injections for her headaches the next month. (R. 634). Although doctors noted the claimant's Tylenol medication overuse in May, she was not overusing medications in September. (R. 18).

Three days later, on September 23, 2016, Dr. Eason performed the claimant's second lumbar medial branch block on her back. (R. 637). After the procedure, she described her pain as a seven. (R. 639).

The claimant followed up with Dr. Skelton on October 17, 2016. During this visit, he recorded the claimant's crying, bad mood swings, excessive stress, and urination problems. (R. 846).

Approximately a month later, on November 16, 2016, the claimant saw Dr. Hogan for her initial Botox injection for her migraine headaches. (R. 824).

From January 2017 through March 2017, the claimant sought treatment from J. Bradley Proctor at Cardiology Consultants for chest pain and shortness of breath, which had been ongoing for weeks. The claimant also complained of daytime sleepiness, weakness, headaches, constipation, diarrhea, indigestion, nausea, leg pain, muscle cramps, anxiety, and depression. On the January 23, 2017 visit, the claimant cried uncontrollably, and Dr. Proctor recorded that the claimant described "her chest pain as an aching sensation in the left center of her chest. Chest pain is not exertional, but she does not perform daily exercise. Shortness of breath is worse with exertion and improves with rest. She states that she is tired all the time." The claimant's echocardiogram and heart catherization showed no significant issues. (R. 667–716).

On February 16, 2017, the claimant followed up with Medical Oncology for her iron deficiency, stating she felt terrible. (R. 726).

The next day, on February 17, 2017, her treating physician Dr. Skelton filled out a medical source statement regarding the claimant's impairments. He noted that he had treated the claimant for more than seven years. Under "Diagnoses," Dr. Skelton listed "Type II DM with neuropathy, hypertension, Fibromyalgia, Depression, migraine headaches." He listed the

claimant's symptoms as "pain, numbness, burning of feet and legs all the time, shortness of breath, overall fatigue, body aches." (R. 836-37).

Dr. Skelton attributed the pain in the claimant's feet and legs to her diabetic neuropathy and her pain all over her body to her fibromyalgia. He specifically stated that she "has all trigger points for fibromyalgia." (R. 836). He noted that her pain and other symptoms constantly interfere with her attention and concentration needed to perform even simple work tasks. He opined that the claimant could sit for about two hours, stand/walk for less than two hours, needed to take unscheduled breaks every thirty to sixty minutes, needed to rest ten to fifteen minutes before returning to work, and would miss more than four days of work per month because of her impairments. (R. 836-37).

From February 2017 through February 2018, the claimant continued to seek treatment from Dr. Hogan for her migraines. During these visits, she received Botox injections, and Dr. Hogan noted she had "more frequent milder headaches" although they were "less frequent and severe overall." (R. 51-57, 815-23).

On Dr. Dubay's referral, the claimant began seeing Dr. K M. Dinesh Chandra at Tuscaloosa Lung, Critical Care & Sleep on March 2, 2017 for her shortness of breath. The claimant also reported double vision, dizziness, chest pain, diarrhea, heartburn, nausea, abdominal pain, painful urination, back pain, joint swelling and stiffness, depression, anxiety, hair loss, daytime sleepiness, excessive fatigue. Dr. Chandra reported the claimant had no joint or limb tenderness to palpation. In the "Assessment" section, Dr. Chandra noted "Fibromyalgia . . . cont meds as advised." Dr. Chandra ordered chest x-rays that were normal and a sleep study that showed obstructive sleep apnea.

The claimant followed up with Dr. Chandra on April 4 and June 20, 2017 with the same complaints. Under the "Assessment" section for both visits, Dr. Chandra again noted "Fibromyalgia . . . continue medication as advised, no specialist, reports only having neurologist." Dr. Chandra noted the claimant's shortness of breath upon exertion; need to use her CPAP machine at night; anxiety at night; and need to increase her activity as tolerated. (R. 757-809).

During a visit at Whatley Health Services on August 28, 2017, Dr. James P. Whitley noted the claimant's hypertension and diabetes were stable. Dr. Whitley included in his "Assessment/Plan" section that the claimant has chronic fibromyalgia and noted she should continue to follow up with Dr. Skelton. (R. 886-903).

On January 13, 2018, Dr. Velda D. Pugh performed a psychiatric examination of the claimant at the request of the Social Security Administration. Dr. Pugh noted the claimant had a depressed mood and dysphoric affect; was alert and oriented to time and place; and had fair concentration, attention, insight, and judgment. Under her "Diagnostic Impression" section, Dr. Pugh listed "Axis III-Fibromyalgia, Chronic Pain, Hypertension, Diabetes and Objesity." She found no limitations in the claimant' ability to understand, remember, and carry out instructions; interact appropriately with supervision, co-workers, and the public; respond to changes in the routine work setting; ability to concentrate, persist or maintain pace; and adopt or manage herself. (R. 911-15).

On June 27, 2018, the claimant returned to Dr. Skelton's office for a follow-up, complaining of leg pain that had persisted over a month. In response, Dr. Skelton order an x-ray of her left lower extremity, but the x-ray showed a normal tibia and fibula. In the "Assessment" section, Dr. Skelton listed "Fibromyalgia." (R. 46-48).

*The ALJ Hearing*

At the scheduled hearing on November 17, 2017, the claimant testified her fibromyalgia and neuropathy cause her a lot of pain and body aches. The numbness in her hands and feet keep her from moving around for too long; her migraines keep her from being out in the light often; and her depression and anxiety keep her from being around people regularly. She cited winter as a difficult season because the cold affects her body, causing more flare-ups. (R. 67-68).

During the hearing, the ALJ asked the claimant if she had been treated by a rheumatologist for her fibromyalgia. The claimant stated her neurologist referred her to one many years ago, but the rheumatologist did not see her on a regular basis. When questioned about her neuropathy, the claimant responded that Dr. Otero performed a nerve conduction test on her roughly four or five years ago. She also testified that she gets her medications from her primary care physician, Dr. Skelton, and Botox injections from her neurologist. (R. 68-69, 73).

Before the Botox injections, her migraines were "so severe that [she] was having chest pains and throwing up," and at one point, she had headaches lasting for six months straight. Although she still had headaches weekly, the Botox injections helped keep her migraines from occurring daily. The migraines that did occur weekly typically lasted one to two days, forcing her to lie down in a dark room and take her migraine medications. She testified the migraines, fibromyalgia, and neuropathy were all contributing factors on why she quit working. (R. 69–72).

Upon questioning from her attorney, the claimant testified that she missed two to three days a month from her past work because of her medical problems. The pain from her fibromyalgia affected her whole body, but primarily affected her hands, arms, legs, and feet. At worst, the pain rated as a nine, "probably five or six days a week." Normally, her pain rated as a seven although it never dipped below a seven in the winter. (R. 74-76).

The claimant further testified that she had tingling in her hands and feet daily. Sometimes the tingling would last for hours, causing problems like dropping things because she was unable to grip them tight enough. She stated she finds herself dropping things two or three times a week; falls sometimes; and has to catch herself from falling daily. She attributes those problems to the "neuropathy in the fibromyalgia" because of the tingling and numbness. (R. 76- 77).

Regarding her pain, the claimant testified that if she sits too long, she becomes stiff and achy. If she stands too long without stretching or moving, her back begins to hurt if she stands the wrong way. She also testified that she can sit 15 to 20 minutes, stand 30 minutes, and walk 10 minutes before she needs to change positions. (R. 78).

She has crying spells almost daily, which last from five to thirty minutes, and she has difficulty being around crowds. The claimant testified she sleeps less than two hours a night, and has diarrhea, which causes her to use the restroom for five to thirty minutes approximately thirty times daily. She also cites problems with walking, stating "right now, the lung doctor wants me to walk 10,000 steps a day[,] [a]nd, the only way [] I've been able to stand it, is to do it ten minutes an hour." Although somedays, she says she "just can't do it." (R. 70–71,78-81, 84–86).

The claimant testified that she took Metformin extended-release, prescribed by Dr. Skelton, for her diabetes; Botox injections and Sumatriptan for her migraines; Neurontin for neuropathy and fibromyalgia; and Xanax and Zoloft for anxiety and depression, which causes side-effects like constipation, diarrhea, sleeplessness, dizziness, and dry mouth. She testified she cannot take Tylenol anymore because it causes rebound headaches; she uses an inhaler for her breathing problems; and she uses a C-PAP for her obstructive sleep apnea (R. 69-70, 72, 76, 79, 84, 87-88).

The claimant also testified that her daily activities involve household chores in increments, sleeping some during the day, and mostly lying down in her room. She can wash dishes and do laundry some days, but she can only do them in increments. She misses church on some Sundays; never goes to Wednesday night church anymore; cannot cut her grass; and does not drive on a regular basis. On the days she does not have migraines, she testified she lies in bed and watches television. (R. 70-71, 80, 84-85).

Vocational expert Dr. Mary House Kessler testified concerning the type and availability of jobs that the claimant can perform. Dr. Kessler testified that the claimant's past relevant work was a special education teacher, classified as light, skilled work; a case manager, classified as light, skilled work; and a job coach, classified as sedentary, skilled work. (R. 89).

The ALJ asked Dr. Kessler to assume a hypothetical individual the same age, education, and experience as the claimant, who is limited to light, unskilled work; does not require complex instructions or procedures; cannot climb ropes, ladders, or scaffolds; cannot work at unprotected heights or with hazardous machinery; can occasionally stoop, crouch, or crawl; can occasionally reach overhead bilaterally; must avoid concentrated exposure to dusts, fumes, or other respiratory irritants; must work inside, not in direct sunlight; must have no concentrated exposure to extreme heat or cold; can have frequent interaction with co-workers and supervisors; and can occasionally have contact with the general public. Ms. Kessler responded that hypothetical person could not perform any of the claimant's past jobs. (R. 90).

The ALJ asked Dr. Kessler if other jobs existed in the national economy that the hypothetical person could perform. Ms. Kessler replied that the hypothetical individual could perform work as a general office clerk, classified as light, unskilled work, with approximately 8,800 jobs in Alabama and 784,000 in the nation; an assembler, classified as light, unskilled

work, with approximately 7,500 jobs in Alabama and 258,100 in the nation; and a packer/packager, classified as light, unskilled work, with approximately 6,400 jobs in Alabama and 513,200 in the nation. (R. 90–91).

In his second hypothetical, the ALJ asked Dr. Kessler to assume all of the prior limitations in addition to the individual having an allowance to miss three or more days per month. Dr. Kessler testified that individual could not perform any of the jobs she just listed or any other jobs in the national economy. (R. 91).

In the ALJ's third hypothetical, he asked Dr. Kessler to assume all of the prior limitations of the first hypothetical in addition to that individual having an allowance to be off task up to twenty percent of an eight-hour workday. Dr. Kessler testified that individual could not perform any of the jobs she just listed or any other jobs in the national economy. (R. 91–92).

The ALJ's last hypothetical asked Dr. Kessler to assume all of the prior limitations of the first hypothetical in addition to that individual having an allowance to lie down for two or more hours during an eight-hour workday. Dr. Kessler testified that individual could not perform any of the jobs she just listed or any other jobs in the national economy. (R. 92).

*The ALJ's Decision*

On May 1, 2018, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 8). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2020. (R. 14). Second, the ALJ found that the claimant has not engaged in substantial gainful activity since December 18, 2015, the alleged onset date. (R. 14).

Next, the ALJ found the claimant had the following severe impairments: diabetes, migraines, depression, anxiety, mood disorder, degenerative disk disease, and neuropathy. He

also found the claimant's non-severe impairments included hypertension, obstructive sleep apnea, and obesity.

Regarding the claimant's fibromyalgia, the ALJ stated that SSR 12-2p "provides that, in order for the Social Security Administration to find that a claimant has the medically determinable impairment of fibromyalgia, the evidence must satisfy either the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia, or the 2010 ACR Preliminary Diagnostic Criteria for Fibromyalgia." He noted that both sets of criteria require evidence of widespread pain in all four quadrants of the body and evidence that other disorders that could cause the claimant's symptoms or signs have been excluded. He also noted that the 2010 criteria require "repeated manifestations of specified fibromyalgia symptoms."

The ALJ did note Dr. Skelton's February 2017 medical source statement that the claimant had all of the trigger points for fibromyalgia. But the ALJ stated that Dr. Skelton's treatment records "[did] not show the required tender point or repeated manifestations findings and [did] not exclude the possibility that other disorders could be causing the claimant's symptoms and signs." The ALJ also stated that the claimant's other physicians also failed to a state a diagnosis of fibromyalgia or show the required findings. As a result, the ALJ found that fibromyalgia was not a medically determinable impairment. (R. 14).

The ALJ found that the claimant did not have an impairment or a combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15). He stated that the record did not establish the medical signs, symptoms, laboratory findings, or degree of functional limitations required to meet or equal the criteria of any listed impairment. He found that the severity of the claimant's physical impairments, considered singly or in combination, does not meet or equal the criteria of

section 1.04, which addresses disorders of the spin, or section 11.14, which addresses peripheral neuropathy; the medical records fail to provide evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis, as reflected in cervical and lumbar MRIs performed in March 2016; and the medical records also fail to provide evidence that shows disorganization of motor function in two extremities resulting in extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities. (R. 15).

The ALJ also found that the severity of the claimant's mental impairments, considered singly or in combination, fails to meet or medically equal the criteria of listing 12.04, which addresses depressive, bipolar, and related disorders, or section 12.06, which addresses anxiety and obsessive-compulsive disorders. He noted that the claimant's abilities and activities indicate that she is able to learn, recall, and use information to perform work activities; she is capable of relating to and working with supervisors, co-workers, and the public; she is able to focus attention and stay on task at a sustained rate; and she is capable of regulating emotions, controlling behavior, and maintaining well-being in a work setting.

To support his finding that the claimant does not meet a mental impairment listing, the ALJ noted that the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation; her primary care physician prescribes her medications; she has not required mental health therapy, organized psychosocial support, or a highly structured setting; and she has not shown an inability to adapt to changes.

The ALJ found that the claimant has underlying medically determinable impairments that could reasonably be expected to produce the claimant's pain and other symptoms. But the ALJ found that the claimant's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in

the record." The ALJ pointed to Dr. Skelton's records and stated that they "do not show significant problems with her hands, dropping things, and falls" and that her "neuropathy generally is stable on Neurontin prescribed by Dr. Skelton." (R. 18).

Regarding her headaches, the ALJ noted the fluctuation in the frequency and severity of them but stated the inconsistent records "note increased migraine days but less frequent and less severe headaches overall. The claimant's treatment records are generally inconsistent with the weekly migraines she reported at the hearing." (R. 18).

Although he found the claimant's fibromyalgia was not a medically determinable impairment, the ALJ said he "fully considered" her reports of pain. But he found the claimant's "treatment records are inconsistent [regarding] reported pain levels and activities of daily living." He said that the August 2016 "notes indicate level 9 pain that was about the same but improvement in her ability to work, cook, stand, drive, perform daily activities, sleep, sit, do housework, engage in hobbies, walk, and exercise." (R. 19).

The ALJ did note the claimant's diagnoses of major depressive disorder and anxiety but stated that her symptoms varied from major crying spells in October 2016 to no symptoms in January 2017. The ALJ pointed to the claimant's lack of treatment with a specialized mental health provider and Dr. Pugh's findings that the claimant had no limitations because of her mental impairments. (R. 19).

Although the ALJ noted the claimant's reports of chest pain, shortness of breath and fatigue, he pointed to her normal electrocardiogram and heart catherization to support his finding that those symptoms are not as severe as the claimant reported. (R. 19).

The ALJ gave Dr. Estock's opinion "good, but not great" weight because the ALJ found the claimant to be more limited in concentration, persistence, or pace "based on subsequent

treatment records." He also gave "good weight" to Dr. Pugh's opinion that the claimant has no significant mental limitations. (R. 20).

The ALJ gave "little weight" to the claimant's treating physician Dr. Skelton's medical source statement because it is "inconsistent with pain management records." The ALJ stated that Dr. Skelton's opinion that the claimant could stand and walk less than two hours, could sit about two hours total in an eight-hour day, and would be absent more than four hours per month was "inconsistent with the claimant's treatment records" but gave no specifics regarding any specific inconsistencies. (R. 20).

After consideration of the entire record, the ALJ found that the claimant has the residual functional capacity to perform light, unskilled work with the following limitations: no complex instructions or procedures; no climbing of ropes, ladders, or scaffolds; no work at unprotected heights or with hazardous machinery; no more than occasional stooping, crouching, or crawling; no more than occasional overhead reaching bilaterally; and no concentrated exposure to dust, fumes, or other respiratory irritants. The ALJ also found that the claimant must work inside, not in direct sunlight; must avoid concentrated exposure to extreme heat or cold; can frequently interact with coworkers and supervisors; and can have occasional contact with the general public. (R. 17).

Relying on the vocational expert's testimony at the hearing and considering the claimant's age, education, work experience, and residual functional capacity, the ALJ found that the claimant is unable to perform any of her past relevant work. But, the ALJ found that other jobs exist in significant numbers in the national economy that the claimant can perform, such as a general office clerk, an assembler, and a packer and packager. As a result, the ALJ concluded

that the claimant has not been under a disability, as defined in the Social Security Act, from December 18, 2015 through the date of the decision. (R. 21-23)

## VI. DISCUSSION

Although the claimant's treating physician of over seven years personally examined the claimant many times, diagnosed the claimant's fibromyalgia as early as 2011, and found that the claimant "has all trigger points for fibromyalgia," the ALJ found that her fibromyalgia did not constitute a medically determinable impairment. That finding lacks reason and substantial evidence does not support it.

In the present case, the claimant argues that the medical evidence supports her fibromyalgia diagnosis as a medically determinable impairment. SSR 12-2p outlines two methods for establishing fibromyalgia as an MDI. Under the 1990 American College of Rheumatology (ACR) standard, a claimant must demonstrate (1) a history of widespread pain in all quadrants of the body, (2) at least eleven out of a possible eighteen tender points found throughout the body, and (3) the exclusion of other disorders that could cause the same symptoms. SSR 12-2p § II.A. Under the 2010 ACR standard, (1) and (3) remain the same, but instead of tender points, the claimant must present evidence of repeated manifestations of at least *six* fibromyalgia symptoms, signs, or co-occurring conditions. SSR 12-2p § II.B.

In the present case, the ALJ found that Dr. Skelton's treatment records and other physicians' treatment records failed to show the required number of tender points under the 1990 criteria or the requisite number of repeated manifestations to satisfy the 2010 ACR standard. The ALJ also found that the claimant's treatment records did not exclude the possibility that other disorders could cause the claimant's symptoms and signs. (R. 14). But substantial evidence does not support the ALJ's findings regarding the claimant's fibromyalgia.

First, the record contains overwhelming evidence of the claimant's widespread pain. For years, the claimant consistently complained of chronic pain all over her body; on the right and left side of her body; in her legs and in her arms; in her back; and in her head. The medical records that the court recounted at length in the fact section above constitute substantial evidence that the claimant has widespread pain in all quadrants of her body.

Dr. Skelton's records indicate that the claimant's fibromyalgia was first diagnosed on July 20, 2011, (R. 405-07), but the court can find no medical records from that date in the record. Dr. Skelton's medical records from September 2014 indicate that he found six of eighteen trigger points for fibromyalgia during that exam. Although Dr. Skelton did not include the number of trigger points during the other examinations of the claimant, he did indicate in his medical source statement that his "diagnoses" of the claimant was fibromyalgia and stated in that opinion that the claimant "has all the trigger points for fibromyalgia." (R. 836–837.) As her treating physician for over seven years, he was in the best position to make that determination.

In addition to Dr. Skelton's medical records, the pain medication injections in the claimant's back and neck, which are areas associated with tender points, also support Dr. Skelton's fibromyalgia diagnosis. *See Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1249 (N.D. Ala. 2003) (J. Guin) ("Objective, clinical support for a diagnosis of fibromyalgia may also be present if injections of pain medication to the trigger areas are prescribed.").

Given the responsibility of the ALJ to develop a full and fair record, the ALJ, at the very least, should have contacted Dr. Skelton about his medical source opinion regarding the claimant's fibromyalgia. The ALJ also should have obtained a consulting examination of the claimant to resolve any inconsistencies in the record regarding whether the claimant truly had "all the trigger points for fibromyalgia." *See Montabano v. Astrue*, No. 1:11-CV-600-TFM, 2012

WL 3778993, at *7 (M.D. Ala. Aug. 31, 2012) (The court could not adequately determine whether the ALJ properly considered the claimant's severe impairment of fibromyalgia because the ALJ failed to resolve inconsistencies in the record or to obtain additional testing or otherwise develop the record.).

But, even if the claimant did not have the required eleven trigger points under SSR 12-2p § II.A, the ALJ's finding that the claimant failed to demonstrate the requisite number of repeated manifestations of co-concurring conditions under SSR12-2p § 11.B lacks substantial evidence. SSR12-2p § 11.B requires *six or more* fibromyalgia symptoms, signs, or co-concurring conditions. Symptoms and signs of fibromyalgia include muscle pain, fatigue or tiredness, muscle weakness, headache, numbness or tingling, dizziness, insomnia, depression, nausea, chest pain, shortness of breath, hair loss, irritable bladders syndrome, constipation and diarrhea. *See* SSR 12-2p § II.B n. 9 (citing 20 C.F.R. 404.1528(b) and 416.928(b) and Table No. 4, "Fibromyalgia diagnostic criteria," 2010 ACR Preliminary Diagnostic Criteria). Some co-occurring conditions include depression, chronic fatigue syndrome, gastroesophageal reflux disorder, and migraines. SSR 12-2p § II.B n. 10.

As recounted previously in the facts section of this opinion, the record shows that the claimant has suffered for years from at least *fourteen* of the signs and symptoms associated with fibromyalgia, including muscle pain, fatigue or tiredness, muscle weakness, migraine headaches, numbness or tingling, dizziness, insomnia and sleep apnea, depression, nausea, chest pain, shortness of breath, hair loss, constipation and diarrhea. No doctor specifically stated that the claimant suffers from more than six of these signs and symptoms, but that specific statement is not necessary for the ALJ to find from the record that the claimant meets SSR12-2p § 11.B. The ALJ should review the medical records and determine if the claimant's signs and symptoms are

consistent with a fibromyalgia diagnosis. SSR 12-2p (The ALJ should "review the physician's treatment notes to see if they are consistent with a diagnosis of [fibromyalgia], determine whether the symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities."). In this case, the claimant consistently reported at least fourteen signs and symptoms of fibromyalgia over the course of many years; was under the care of a pain management specialist; and received several pain blocks to help alleviate her pain.

Moreover, Dr. Smith and NP Brewer at the Alabama Pain Management Physicians opined in 2016 that the claimant's generalized pain is "likely from fibromyalgia" and that her depression and obstructive sleep apnea were "likely comorbid with FM and part of the same disease process." The ALJ's findings that the claimant's treatment record did not show repeated manifestations of co-concurring conditions of fibromyalgia lacks substantial evidence in the record to support it.

The ALJ further found that the record contains no evidence of the exclusion of other possible causes for these signs and symptoms associated with fibromyalgia. Substantial evidence does not support this finding. The claimant visited specialists for her back and limb pain, chest pain, shortness of breath, insomnia and sleep apnea, anemia and fatigue, and migraines. Her primary care doctor or her pain specialist referred her to each of these specialists or prescribed testing to find the causes of her signs and symptoms in a concerted strategy to establish the cause of the claimant's symptoms and treat that cause.

No specialist offers an alternative explanation for the claimant's generalized pain other than fibromyalgia. All of the objective tests, including CT scans, MRI scans, x-rays, an echocardiogram, and a heart catherization, conducted to rule out other causes were essentially

normal. In fact, Dr. Smith from the Alabama Pain Management Physicians, the medical group best positioned to determine a different etiology for the claimant's generalized pain, specifically states that the claimant's generalized pain "is likely from her fibromyalgia."

The ALJ correctly notes that no doctor explicitly states that he or she has excluded other possible conditions. But the lack of an explicit statement by a doctor does not mean doctors did not actually exclude other possible conditions. If the ALJ was not satisfied with the findings of all of the specialists who ruled out other causes of the claimant's signs and symptoms, he should have ordered a consultative examination or requested clarification regarding whether the claimant's repeated visits to medical professionals for her chronic pain constituted an exclusion of other possible causes of the claimant's pain.

The claimant also asserts that the ALJ committed error by failing to properly consider her subjective complaints of pain. Considering this court's determination regarding her fibromyalgia, the court need not reach this argument. But the court notes that if properly diagnosed, fibromyalgia can satisfy the pain standard. *Bennett,* 288 F. Supp. 2d at 1249 (*citing Kelley*, 133 F.3d at 589).

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be REVERSED AND REMANDED for action consistent with this opinion.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 16th day of March, 2020.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE